J-A13029-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA

v.

NORMAN FRED PENNINGTON

Appellant

: IN THE SUPERIOR COURT OF
:            PENNSYLVANIA
:
:
:
:
:
:
:
:
:
: No. 955 WDA 2025

Appeal from the Judgment of Sentence Entered July 11, 2025
In the Court of Common Pleas of Fayette County Criminal Division at
No(s): CP-26-CR-0001113-2024

BEFORE: BOWES, J., OLSON, J., and BENDER, P.J.E.

MEMORANDUM BY OLSON, J.:                          **FILED: JULY 2, 2026**

Appellant, Norman Fred Pennington, appeals from the judgment of sentence entered July 11, 2025, as made final by the denial of his post-sentence motion on July 23, 2025. We affirm.

The trial court summarized the relevant facts and procedural history of this case as follows.

> On April 12, 2024, Anthony DeCenzo (hereinafter "DeCenzo"), the victim, drove to the residence of his life-long friend, [Appellant]. When DeCenzo failed to return home that night, his wife filed a missing person's report. On April 14, 2024, the Pennsylvania State Police located [DeCenzo's] car parked in a gravel pull off area on Riffle Hollow Road in German Township[, Fayette County, Pennsylvania]. [Upon arrival], the [t]roopers located [DeCenzo's corpse] laying in the back seat of the vehicle covered by a tarp. DeCenzo had two gunshot wounds to his head. The blood smears from the front seat to the back seat indicated that [DeCenzo's] body had been moved from the front seat to the back seat of the vehicle. On a piece of paper in the console was a note with the name "Norman" and a telephone

number on it. The [telephone] number belonged to [] Appellant.

Pennsylvania State Trooper [Tyler] Shutterly interviewed [] Appellant the next day. The Trooper testified that [] Appellant informed him that [DeCenzo] had visited him on April 11, 2024. They were going to look at [a] property that [DeCenzo] wanted to purchase. However, [] Appellant informed the Trooper that the man they were to meet [] failed to show. The Trooper stated that [] Appellant [] informed him that he assisted [DeCenzo] in locating property for purchase and [] Appellant would be paid a few hundred dollars for his work. [] Appellant stated he was at his barber shop on April 12, 2024, and then later that day, he went to the hospital for treatment of an injury to his shoulder.

Trooper Shutterly also interviewed [DeCenzo's] wife, who informed him that her husband was trying to purchase The Village Lounge and also five acres of land for a trailer. She informed the Trooper that her husband kept between [30] to [40] thousand dollars in a drawer in the kitchen. This money was now missing from the kitchen. Mrs. DeCenzo informed the Trooper that her husband had multiple meetings set up with [] Appellant and the owners of the property but the meetings kept getting cancelled. Her husband was upset with [] Appellant and wanted [Appellant to return] the money advanced [by DeCenzo].

The owner of The Village Lounge testified that DeCenzo had inquired about purchasing his bar but he wasn't interested in selling for the amount offered. [] Appellant also offered him money to purchase the bar and then let the owner operate it for them[] but[,] again[,] the owner was not interested.

Surveillance cameras around the area of Appellant's barber shop showed that on April 12, 2024, [] Appellant had left his business and was gone from 10:33 [a.m.] until 2:45 [p.m.] A trail camera was located which recorded [] DeCenzo's vehicle traveling near the area where it was finally located. The [Pennsylvania] State Police tracked the location of [] Appellant's cellular [tele]phone, [a cellular tele]phone] owned by DeCenzo, and, later in the investigation, the [cellular tele]phone of John Preston.

While [Appellant] was being questioned at the Pennsylvania State Police Barracks, [his wife, Donna Pennington, was also

- 2 -

subjected to police interrogation]. After being read her ***Miranda***[1] Rights Warning and Waiver form, Appellant's wife agreed to speak with the Troopers. She informed them that her husband returned from his barber shop about 11:00 [a.m.] on April 12, 2024, [and that] she saw him leave in a white four door sedan that she hadn't seen previously. She was unsure of the owner of that vehicle.

A short time after the sedan left, Appellant's wife stated that the Appellant called her and asked her to meet him at [the intersection of] Filbert Orient Road and Bunker Hill Road. When she arrived at that location, [] Appellant was operating the white sedan, [and] she followed him until he pulled off the road onto a gravel pull off. The white sedan was facing away from the roadway by a gate. [] Appellant got into his wife's vehicle and told her to drive him home.

After the first interview, the Pennsylvania State Police [] interviewed [] Appellant [again.] Initially, Appellant denied being with [DeCenzo] or knowing anything about his murder. Subsequently, [however,] Appellant admitted that [] DeCenzo came to his house [seeking the return of previously advanced money]. Appellant stated that [DeCenzo] pulled a gun and threatened to kill him. [] Appellant said being in fear for his life, he grabbed the gun and shot [DeCenzo twice].

Subsequently, the State Police interviewed John Preston, the son of [Appellant's] friend[.] … Preston owned the building where [] Appellant operated his barber shop. Preston testified that[,] on April 11, 2024, [] Appellant asked to borrow a firearm from him and he loaned Appellant a .380 [caliber] handgun. Then[,] on April 12[, 2024,] Appellant returned the gun to [Preston] wrapped in a blue shop towel. After [] Appellant was charged, Preston testified that he turned the gun over to the police.

At the trial, the Commonwealth presented videos of the interview of [] Appellant with the Troopers when he initially denied being around [DeCenzo on] the date of his death and then his confession that he had shot [DeCenzo] in self-defense.

[] Appellant testified [that, after the shooting,] he was freaking out. He drove to his shop and changed clothes. He [then]

_____

[1] ***Miranda v. Arizona***, 384 U.S. 436 (1966)

called his wife to follow him and [] drive him home. Several days later in a jail house [tele]phone call, [] Appellant told his wife to talk to Preston and tell him to get rid of it. When [] Appellant subsequently learned that Preston had turned over the gun, [] Appellant changed his story and informed Trooper Shutterly that Preston was the killer.

At trial, the Appellant testified that when DeCenzo arrived on April 12[, 2024,] DeCenzo was operating the vehicle and Preston was in the passenger seat of DeCenzo's vehicle. [] Appellant testified that he was in the back seat. He stated that Preston suddenly pulled out a gun, shot [DeCenzo] twice in the head, then exited the vehicle. [] Appellant testified that Preston threatened to kill him and kill his grandson if the Appellant didn't help him. [] Appellant testified that he covered for Preston because [Preston's] father was his best friend, even though he was now deceased. He testified that Preston pulled DeCenzo's body to the back of the car. At that point, [] Appellant got the Frozen Disney blanket out of the car and put it on the front seat. [] Appellant admitted that he wiped down the inside of the vehicle to eliminate fingerprints.

In the interview with the State Police when he first confessed, [] Appellant stated that the gun was thrown into Dunlap Creek. [] Appellant admitted in his testimony that he told his wife to get rid of the handgun, which was confirmed in a taped jail conversation. [] Appellant admitted that he wiped off the steering wheel and other areas of the car. He also took his clothing[,] which was blood splattered[,] and threw the bag of clothing away, but the clothing was later recovered.

Trial Court Opinion, 2/18/26, at 2-5 (internal citations omitted).

On June 13, 2021, the Commonwealth charged Appellant with criminal homicide and related offenses. The matter proceeded to a jury trial. Ultimately, the jury convicted Appellant of first-degree murder, tampering with evidence, and persons not to possess a firearm.[2] That same day, the trial court sentenced Appellant to a mandatory sentence of life imprisonment

_____

[2] 18 Pa.C.S.A. §§ 2502(a), 4910(1), and 6105(a)(1), respectively.

on his first-degree murder conviction and no further penalty for Appellant's remaining convictions. Appellant filed a post-sentence motion on July 15, 2025, which the trial court denied on July 23, 2025. This timely appeal followed.

Appellant raises the following issues for our consideration.

1. Did the Commonwealth present sufficient evidence to prove beyond a reasonable doubt that [] Appellant had the specific intent to kill required for a conviction of first[-]degree murder?

2. Did the trial court err in granting the motion by the Commonwealth to amend the information relating to the charge of tampering with evidence, after the Commonwealth closed its case[-]in[-]chief?

3. Did the trial court err in permitting handwritten documents to be provided to the jury during their deliberations when some of the documents had not been authenticated as written by a particular person and no independent handwriting experts had testified as to the possible provenance of the handwriting?

4. Were certain trail camera photo[graphs] and surveillance videos sufficiently authenticated to be admitted into evidence and published to the jury?

Appellant's Brief at 4.

In his first issue, Appellant challenges the sufficiency of the evidence supporting his first-degree murder conviction. Appellant contends that the Commonwealth failed to present sufficient evidence to support a finding that he harbored a specific intent to kill DeCenzo. We disagree.

- 5 -

"A claim impugning the sufficiency of the evidence presents us with a question of law." **Commonwealth v. Antidormi**, 84 A.3d 736, 756 (Pa. Super. 2014) (citation omitted).  Our standard of review is well-established:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt.  In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder.  In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence.  Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances.  The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered.  Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.
>
> This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt.  Although a conviction must be based on more than mere suspicion or conjecture, the Commonwealth need not establish guilt to a mathematical certainty.

**Id.** (citations and quotations omitted).

"A criminal homicide constitutes murder of the first[-]degree when it is committed by an intentional killing."  18 Pa.C.S.A. § 2502(a).  The legislature has defined "intentional killing" as a "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing."

18 Pa.C.S.A. § 2502(d). "In order to prove first-degree murder, the Commonwealth must establish that: (1) a human being was killed; (2) the accused caused the death; and (3) the accused acted with malice and the specific intent to kill." *Commonwealth v. Poplawski*, 130 A.3d 697, 709 (Pa. 2015) (citation omitted). "The jury may infer the intent to kill based upon the defendant's use of a deadly weapon on a vital part of the victim's body." *Id.*

Appellant's claim fails. First, the Commonwealth presented evidence that one of two gunshots to DeCenzo's head caused his death. *See* N.T. Trial, 7/8/25, at 7 and 11 (testimony indicating that DeCenzo suffered "two injuries that were specifically gunshot wounds to his head" and that "either one of the gunshot wound injuries were highly likely to be fatal."). Hence, the jury was permitted to infer intent to kill. Second, the Commonwealth presented evidence and testimony that placed Appellant with DeCenzo at the time of the murder. More specifically, the Commonwealth initially demonstrated that Appellant and DeCenzo were together at Appellant's residence around the time of DeCenzo's death and then traveled from Appellant's residence to the location where DeCenzo's body was eventually found through cellular tracking and video surveillance. *See* N.T. Trial, 7/9/25, at 171-180. This evidence was bolstered by Appellant's wife's testimony, who stated that she "saw [Appellant] drive [from their house] in a white car," later identified as DeCenzo's vehicle, and that Appellant subsequently called her and asked her to "follow[] that white car to the gravel pull off where [DeCenzo's] . . . body

[was] ultimately located." Trial Court Opinion, 2/18/26, at 6-7. Third, the Commonwealth presented evidence that placed Appellant in the front seat of the vehicle at the time of the shooting. *See* N.T. Trial, 7/8/25, at 19-32. While Appellant initially attempted to claim that he acted in self-defense and, later, that John Preston killed DeCenzo and that Appellant took the blame because Preston was his friend's son, the "jury heard [] Appellant's contradicting statements about what happened to DeCenzo" and was free to draw their own conclusions. Trial Court Opinion, 2/18/26, at 7; *see also Commonwealth v. Youngster*, 352 A.3d 1052, 1059 (Pa. Super. 2026) ("[T]he evidence at trial need not preclude every possibility of innocence, and the fact-finder is free to resolve any doubts regarding a defendant's guilt unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. When evaluating the credibility and weight of the evidence, the fact-finder is free to believe all, part or none of the evidence."). In viewing the aforementioned evidence in a light most favorable to the Commonwealth, we conclude that the evidence in this matter was sufficient to sustain Appellant's conviction for first-degree murder.

In his second issue, Appellant argues that the trial court erred in permitting the Commonwealth to amend the information relating to the charge of tampering with evidence after the prosecution concluded its case-in-chief. Appellant complains that the amendment altered the factual basis for the criminal charge and was only requested after he moved to dismiss the offense.

Accordingly, Appellant argues that the trial court's decision to permit the Commonwealth to amend the criminal information prejudiced him. We disagree.

This Court recently determined:

We review a trial court's decision to grant or deny a motion to amend an information for an abuse of discretion. *See Commonwealth v. Small*, 741 A.2d 666, 681 (Pa. 1999). As we have explained,

[a]n abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record. If, in reaching a conclusion, the trial court overrides or misapplies the law, discretion is then abused and it is the duty of the appellate court to correct the error.

*Commonwealth v. Belknap*, 105 A.3d 7, 10 (Pa. Super. 2014) (citations omitted and some formatting altered).

Rule 564 of the Pennsylvania Rules of Criminal Procedure provides as follows:

The court may allow an information to be amended, provided that the information as amended does not charge offenses arising from a different set of events and that the amended charges are not so materially different from the original charge that the defendant would be unfairly prejudiced. Upon amendment, the court may grant such postponement of trial or other relief as is necessary in the interests of justice.

Pa.R.Crim.P. 564.

"[T]he purpose of Rule 564 is to ensure that a defendant is fully apprised of the charges, and to avoid prejudice by prohibiting the last minute addition of alleged criminal acts of which the defendant is uninformed." *Commonwealth v. Sinclair*, 897 A.2d 1218, 1221 (Pa. Super. 2006) (citation omitted). "[O]ur

courts apply the rule with an eye toward its underlying purposes and with a commitment to do justice rather than be bound by a literal or narrow reading of [the] procedural rules." ***Commonwealth v. Grekis***, 601 A.2d 1284, 1289 (Pa. 1992).

When presented with a question concerning the propriety of an amendment, we consider:

> [w]hether the crimes specified in the original indictment or information involve the same basic elements and evolved out of the same factual situation as the crimes specified in the amended indictment or information. If so, then the defendant is deemed to have been placed on notice regarding his alleged criminal conduct. If, however, the amended provision alleges a different set of events, or the elements [of,] or defenses to[,] the amended crime are materially different from the elements or defenses to the crime originally charged, such that the defendant would be prejudiced by the change, then the amend[ment] is not permitted.

***Commonwealth v. Mentzer***, 18 A.3d 1200, 1202 (Pa. Super. 2011) (citations omitted).

> Since the purpose of the information is to apprise the defendant of the charges against him so that he may have a fair opportunity to prepare a defense, our Supreme Court has stated that following an amendment, relief is warranted only when the variance between the original and the new charges prejudices [a defendant] by, for example, rendering defenses which might have been raised against the original charges ineffective with respect to the substituted charges.

***Sinclair***, 897 A.2d at 1223 (citation omitted).

In determining whether a defendant suffered prejudice, we consider the following factors:

> (1) whether the amendment changes the factual scenario supporting the charges; (2) whether the amendment adds new facts previously unknown to the defendant; (3) whether the entire factual scenario was developed during a preliminary hearing; (4)

- 10 -

> whether the description of the charges changed with the amendment; (5) whether a change in defense strategy was necessitated by the amendment; and (6) whether the timing of the Commonwealth's request for amendment allowed for ample notice and preparation.

*Mentzer*, 18 A.3d at 1203 (citation omitted).

*Commonwealth v. Berrios*, 343 A.3d 219, 2025 WL 1693940, at * 6–7 (Pa. Super. 2025) (non-precedential decision) (brackets in original).[3]

In the original criminal information, the Commonwealth herein specified that Appellant committed the crime of tampering with evidence by throwing the firearm used in the commission of the murder into a body of water. *See* Criminal Information, 7/17/24, at 1. The evidence presented a trial, however, indicated that the firearm was not, in fact, disposed of in such a manner and, instead, was returned to the original owner, John Preston, who subsequently provided it to the authorities. Accordingly, after the Commonwealth's case-in-chief, Appellant made a motion for judgment of acquittal on all counts. The following exchange occurred when discussing Appellant's motion with respect to count three, tampering with the evidence.

> The court: Do you want to put the cause on there?
>
> [Defense counsel]: Well, Your Honor, . . . as for [c]ount [three – evidence tampering,] for throwing a gun [into] a lake, [it] has been proven . . . [that] never happened.
>
> ***

---

[3] *See* Pa.R.A.P. 126(b) (providing that unpublished non-precedential memorandum decisions of the Superior Court filed after May 1, 2019 may be cited for their persuasive value).

[The Commonwealth]: Okay. I do concede that [c]ount [three] does say that . . . the nature of the tampering was throwing the gun in a body of water. When the charges were filed, that is the information that was provided, the fact that the gun wasn't in a body of water, I believe constitutes the offense of tampering. He gave us incorrect information as to where the gun was located, he knew where the gun was located. I would also say that we should be able to proceed on that charge, based on what we have which is throwing clothing over the hillside, which he later took to the state police[,] as well as moving the body to the backseat of the vehicle before he took it to the final location. I would ask that you deny it as well.

The court: Is that charged in the information?

[The Commonwealth]: No, it specifically says in a body of water. I do concede that it says, that the nature of the tampering is throwing the gun in a body of water. I did not ask to make an amendment.

The court: And aren't[?]

[The Commonwealth]: [] I'm making it now but I understand that we're at the close of the case.

N.T. Trial, 7/10/25, at 62-64. Appellant objected to the Commonwealth's request. The trial court then deferred ruling upon the matter but, ultimately, after Appellant presented his case-in-chief, permitted the amendment. The Court stated:

My five colleagues believe that because it's the same charge, [t]ampering [w]ith [p]hysical [e]vidence[, . . . b]ut just different physical evidence [which does not] even need to be specified in the information and that, that it's okay to stretch the wording. . . on the information to include the things which [Appellant] now has himself admitted [like] wiping down the car and throwing his duffel bag over the hill [because . . . ] that's not new, it's the same charge.

*Id.* at 120.

Upon review, we cannot say that, in reaching the aforementioned conclusion, the trial court abused its discretion. First, as the Commonwealth points out, the amendment did not alter the criminal charge but, instead, simply removed the specific language pertaining to the disposal of the firearm. Second, Appellant concedes in his appellate brief that he was aware of the factual basis for the amendment as early as the preliminary hearing in this matter. *See* Appellant's Brief at 17. Third, the amendment did not necessitate a change in defense strategy. At trial, Appellant sought to defend against the evidence tampering charge by claiming that John Preston murdered DeCenzo and that his own involvement was limited to transporting DeCenzo's body, wiping the vehicle of fingerprints/DNA and disposing of his blood-soaked clothing because Preston threatened to harm him and his family. *See* N.T. Trial, 7/10/25, at 72-76. This is the exact evidence the Commonwealth and the trial court relied upon to sustain the criminal charge. Finally, Appellant cannot maintain that the late amendment prejudiced him because the trial court offered to allow him to present additional evidence, but Appellant declined. *See* N.T. Trial, 7/10/25, at 122; *see also Commonwealth v. Fowler*, 393 A.2d 844, 847 (Pa. Super. 1978) (explaining that the defendant's failure to "request permission to recall [] witnesses for further cross-examination" or otherwise "seek a postponement or other relief" negated his claim that the amendment to the criminal information was prejudicial). Appellant, therefore, is not entitled to relief.

In his third issue, Appellant challenges the trial court's decision to allow the jury to review two handwritten documents during its deliberations. By way of background, the first document challenged by Appellant was a note recovered from his place of business. Appellant authenticated the document when he testified during cross-examination. *See* N.T. Trial, 7/10/25, at 106-108. The second document was a note recovered in a local drug house and given to police during their investigation into this matter. The note states that John Preston owed DeCenzo $12,000.00 and that he, not Appellant, was the individual responsible for killing DeCenzo. *See* N.T. Trial, 7/9/25, at 148, Exhibit 89. During Appellant's cross-examination, he denied that he wrote the note recovered in the drug house. *See* N.T. Trial, 7/10/25, at 108. The jury requested both documents during deliberations, which the trial court permitted over Appellant's objection. Now, on appeal, Appellant challenges the trial court's decision, claiming that, by allowing the documents to be submitted to the jury, the trial court "invited [them] to make an independent and inexpert assessment of its authorship" which "could only bias the outcome of the trial." Appellant's Brief at 22.

This Court previously stated:

> Ordinarily, whether an exhibit should be allowed to go out with the jury during its deliberation is within the sound discretion of the trial judge.
>
> This discretion, however, is not absolute. Pennsylvania Rule of Criminal Procedure 646 expressly forbids juries from having certain enumerated categories of exhibits during deliberations, including written defendant confessions. *See* Pa.R.Crim.P. 646(C). The underlying reason for excluding certain items from

the jury's deliberations is to prevent placing undue emphasis or credibility on the material, and de-emphasizing or discrediting other items not in the room with the jury. If there is a likelihood that the importance of the evidence will be skewed, prejudice may be found; if not, there is no prejudice *per se* and the error is harmless.

***Commonwealth v. Miller***, 172 A.3d 632, 648 (Pa. Super. 2017) (quotations, original brackets, and case citations omitted).

We discern no abuse of discretion on the part of the trial court. Initially, we note that the documents at issue are not the type that are specifically prohibited under Pa.R.Crim.P. 646(C). Moreover, we reject Appellant's contention that the trial court's decision "invited" the jury to make an "independent and inexpert assessment of authorship" because Appellant, himself, admitted that he authored the document recovered from his place of business. Appellant's Brief at 22; ***see also*** N.T. N.T. Trial, 7/10/25, at 108. Hence, the authorship of this document was not in dispute. In addition, any claim that the jury is prohibited from making a comparison of writings is contrary to the case law promulgated throughout this Commonwealth. Indeed, "Pennsylvania jurisprudence has long held that '[c]omparisons of handwriting may be made by a jury' and that 'expert testimony [regarding] authenticity is not necessary and the jury may, by comparison of writings, decide whether the authenticated writing was made by the same person as the writing in dispute.'" ***Commonwealth v. Sexton***, 222 A.3d 405, 417 (Pa. Super. 2019) (citations omitted). Finally, as the trial court points out, the document found in the drug house supported Appellant's defense, *i.e.*, that

John Preston murdered DeCenzo. As such, Appellant is unable to establish prejudice. For all of the foregoing reasons, we reject Appellant's claim.

We now turn to Appellant's final claim error. Appellant argues that the trial court erred in admitting "multiple pieces of digital evidence in the form of photographic still images and video records . . . gathered from a variety of private citizens" that "purported to show the path of travel that [Appellant] took from his own residence to the location were Pennsylvania State Police eventually located [DeCenzo's] car and body." Appellant's Brief at 22-23. Appellant's chief complaint is that such evidence was not sufficiently authenticated and, as such, should not have been admitted during trial. We disagree.

Rule 901 of the Pennsylvania Rules of Evidence governs the authentication of evidence. It states, in relevant part, as follows,

> **(a) In General.** Unless stipulated, to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.
>
> **(b) Examples.** The following are examples only--not a complete list--of evidence that satisfies the requirement:
>
> > **(1) Testimony of a Witness with Knowledge**. Testimony that an item is what it is claimed to be.
> >
> > ***
> >
> > **(9) Evidence About a Process or System**. Evidence describing a process or system and showing that it produces an accurate result.
> >
> > ***

- 16 -

> **(11) Digital Evidence**. To connect digital evidence with a person or entity:
>
>> (A) direct evidence such as testimony of a person with personal knowledge; or
>>
>> (B) circumstantial evidence such as:
>>
>>> (i) identifying content; or
>>>
>>> (ii) proof of ownership, possession, control, or access to a device or account at the relevant time when corroborated by circumstances indicating authorship.

Pa.R.E. 901(a), (b)(1), (9) and (11). Importantly, "authentication requires a low burden of proof." ***Commonwealth v. Jackson***, 283 A.3d 814, 818 (Pa. Super. 2022).

Appellant's claim fails. First, Appellant's claim is subject to waiver. Indeed, on appeal, Appellant vaguely argues that the trial court erred in admitting, without proper authentication, "certain photographs and video recordings" or "multiple pieces of digital evidence." Appellant's Brief at 22 (capitalization omitted). Appellant does not, at any point, identify which Commonwealth exhibits he believes were improperly admitted by the trial court. This Court has repeatedly held that the "failure to develop an adequate argument in an appellate brief may [] result in waiver of the claim under Pa.R.A.P. 2119" and that we will "not develop an argument for an appellant, nor shall we scour the record to find evidence to support an argument; instead, we will deem [the] issue to be waived." ***Milby v. Pote***, 189 A.3d 1065, 1079 (Pa. Super. 2018) (citations omitted).

Second, even if we consider the merits of Appellant's claim, it fails.  In its 1925(a) opinion, the trial court addressed Appellant's claim as follows:

Trooper Bradon Madden testified that he was directed by his supervisors to investigate to see if there were any video surveillance cameras in the surrounding areas.  As part of his investigation, Trooper Madden located trail cameras owned by Mark Jeffries who resided [along] High Street and faced toward Main Street.  The Trooper was given access to Jeffries' camera system.  The Trooper accessed the recording system [and] compared the version he was observing to the date and time when he accessed the system on May 29, 2024 to make certain that the times and dates were correct.  When he determined that the recording time on camera was correct, he went back to April 12, 2024 and collected photographs from 10:35 [a.m.] until [nighttime] on that date.

***

Trooper Madden personally accessed the Jeffries['] camera system.  He downloaded the photo[graphs] after ensuring that the time stamp and date were correct on the photo[graphs].  The fact that he did not own the system is not essential to the admissibility of the photo[graphs] from the trail cameras.  The steps that he took established a sufficient indicia of reliability of the timing listed on the photo[graphs].  The timing was consistent with other testimony presented during trial[, including Appellant's].

Trial Court Opinion, 2/18/26, at 11-12.  Our review of the certified record confirms the trial court's findings.  As such, we discern no abuse of discretion.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 7/2/2026